UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

STEVEN OGDEN                          *        NO:   12-1835
                                      *
VERSUS                                *        SECTION:   L
                                      *        JUDGE ELDON E. FALLON
GLOBALSANTAFE OFFSHORE SERVICE        *        MAGISTRATE: 4
AND TRANSOCEAN OFFSHORE               *        JUDGE KAREN WELLS ROBY
DEEPWATER DRILLING, INC.              *

## PLAINTIFF STEVEN OGDEN'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff Steven Ogden opposes Global Santa Fe Offshore Services (GSF) and Transocean Offshore Deepwater Drilling, Inc.'s (TODDI) Motion for Summary Judgment and/or alternatively Motion to Dismiss.  Ogden hereby adopts all of the arguments previously made in the record of this matter, specifically his Response Memorandum in Opposition (Rec. Doc. 8), Supplemental Memorandum (Rec. Doc. 18), Second Supplemental Memorandum in Opposition (Rec. Doc. 23) and (Third) Supplemental Memorandum (Rec. Doc. 27).  Ogden supplements his briefing currently in the record as follows.

I.  DISCOVERY OF THE RIG HANDS:

This court previously denied GSF/TODDI's Motion and allowed the parties time to conduct jurisdictional discovery and to explore the relationship the rig hands had to the subject rig.  It has been established that the following rig hands received their paychecks from GSF at the time of the accident:

Plaintiff/Assistant Driller Ogden, Rig Manager Bobby Ray Humphries, OIM

Greg Magee, Senior Toolpusher Bobby Odom, Toolpusher Albert Hartley and

Driller Michael Grant.[1]

Discovery has shown that GSF paid employees ran the rig as well as operated as the rig

manager on land in Egypt.

Greg Magee was the OIM aboard the AMIRANTE (the subject rig on which

Ogden's accident occurred) while the rig operated off the coast of Egypt.[2]  Magee also

acted as rig manager from time to time while the rig was off the coast of Egypt.[3]  While

Magee did know the name of the entity that had entered into the drilling contract, he

explained he knew this information only because his job as OIM required him to refer to

the contract often.[4]  Magee was specifically asked if he felt he worked for the Transocean

Egyptian company while he worked off the coast of Egypt, to which he answered no:

> Q.  Do you think you ever worked for that Red Sea
>      entity any time you were over in Europe?
>
> A.  No, I didn't.
>
> Q.  Okay, do you think you were ever employed by them?
>
> A.  No.[5]

When Magee was transferred over to Egypt, he never re-applied for employment or

signed any new employment documents.[6]

---

[1] Please see GSF's Answer to Discovery attached as Exhibit 1.  GSF has since stipulated that Humphrey's received his check from GSF also.
[2] Attached as Exhibit 2 please find deposition testimony of Greg McGee, pages 7-8.
[3] Exhibit 2, page 9.
[4] Exhibit 2, page 14.
[5] Exhibit 2, page 16-17

Magee testified that he went to the Houston, Texas building of Transocean located at Park 10 many times over the years of his employment with Transocean. He received various training required for his job at this location.[7]

Magee was questioned about who he believed gave the rig hands their day to day instructions. Magee stated that in general the OIM did such, and he did not believe the rig manager, from the location on land where he worked, had the ability to really direct and control the day to day work of the rig hands.[8]

Albert Hartley was the toolpusher aboard the rig at the relevant time. He testified that he never knew the exact name of the entity that signed the drilling contract, but that he did know he was getting his paychecks from GSF while he worked overseas.[9] Hartley, like Magee, stated that he did not believe himself to be employed by an Egyptian company, including specifically the Transocean Red Sea entity.[10] Hartley explained that Ogden would have taken his day to day orders from his driller, Michael Grant (it is uncontested that Grant received his paychecks from GSF), and then from the Toolpusher (Hartley).[11] Hartley got his instructions and was under the control of the OIM, Magee.[12]

Bobby Odom was the Senior Toolpusher. He never knew the name of the Egyptian company and he testified that he never thought he was working for an Egyptian company while working off the coast of Egypt:

Q. At any point in time when you were on the Amirante

---

[6] Exhibit 2, 27-28.
[7] Exhibit 2, pages 25-26.
[8] Exhibit 2, pages 30-32.
[9] Please see depositions testimony of Hartley attached as Exhibit 3, pages 10-13.
[10] Exhibit 3, page 12-13.
[11] Exhibit 3, pages 19-20.
[12] Exhibit 3, page 22.

off the coast of Egypt, would you have ever thought
that you would have been employed by an Egyptian
company?

A.  No sir.[13]

Odom also was never aware of the name of the Transocean party that entered into the

drilling contract.[14]  Odom also received all of his training from the Houston office of

Transocean and he specifically believed he was employed by the company out of

Houston.[15]  As for day to day control of the rig, Odom testified that the OIM (Magee)

was the one who controlled the day to day activities on the rig.[16]

Discovery has shown that the GSF paycheck issued individuals played a critical

role on the rig and controlled the day to day activities of the rig hands, including Ogden.

These GSF employees for the most part never saw the contract mentioning the name

'Transocean Red Sea' (with the exception of Magee due to his role as OIM) and they all

said they did not believe that they were employed by such entity, or any other Egyptian

company.

II.    JURISDICTION IS PROPER AS HELD BY JUDGE BARBIER IN THE
        JOHNSON MATTER:

Ogden urges this Court to rule consistent with Judge Barbier's ruling in the

Johnson matter in regard to jurisdiction over GlobalSantaFe Offshore Services under

Rule 4(k)(2).  Additionally, in this matter there are significant facts specific to this case

which give rise to jurisdiction in Louisiana.

---

[13] Attached as Exhibit 4 please find deposition testimony of Bobby Odom, page 23.
[14] Exhibit 4, page 22.
[15] Exhibit 4, pages 25-28.
[16] Exhibit 4, page 30.

As previously briefed in Record Document 8, pages 11-13, Ogden has been receiving cure treatment in the State of Louisiana since his injury. This treatment has been paid for by defendant TODDI. Therefore, as Ogden's employer GSF has essentially satisfied its cure obligation, in part, through activities and medical treatment taking place in the State of Louisiana. Such cure activities can support jurisdiction within the State of Louisiana over GSF and TODDI. Please see citations in Rec. Doc. 8, page 12.

II.     CONCERNING GSF'S STATUS AS A JONES ACT EMPLOYER, THIS CASE
        IS SUBSTANTIALLY DIFFERENT THAN JOHNSON:

GSF relies upon Johnson in urging this Court to hold that GSF is a "paymaster" in this case. However, the facts of this case are different.[17]

First and foremost, Ogden is alleging an actual employer/employee relationship between himself and GSF and TODDI. In Johnson, plaintiff James Johnson was filing a third-party claim against GSF and urging Judge Barbier to find that GSF was responsible for the actions of the rig hands under respondent superior. In this case there is a direct Jones Act employee/employer relationship between Ogden and GSF making the facts of this case identical to Spinks. In Johnson, Judge Barbier specifically recognized that the facts before him did not involve a direct Jones Act relationship thereby distinguishing his facts from those of the Spinks and Guidry:

> Further, the atypical and somewhat relaxed standard applied under the Jones Act is likely a result of the fact that the Jones Act is "for the benefit and protection of seamen who are peculiarly the wards of admiralty." The Arizona v. Amelich, 298 U.S. 110 (1936) (The Act's "purpose was to enlarge that protection, not to narrow it.") Thus, this seemingly lower

---

[17] It should also be noted that the GSF decision in Johnson is on appeal.

threshold cannot be transposed onto standard negligence claims brought pursuant to general maritime law. While general maritime law will often involve seamen, thus arguable should be subject to the same relaxed standards, GSF is not and could never be considered Johnson's Jones Act employer under these facts, and the Court declines to expand the protections of the Jones Act beyond the reaches of the statute.

Additionally, in Johnson Judge Barbier relied specifically upon the fact that the rig manager on land who was purported to be over the entire rig crew was employed by the foreign entity and not GSF:

Emeka Ochonogor, a rig manager for TSSN, submitted an affidavit wherein he states that, in November 2010, TSSN was supplying two rigs to Afren Resources, Ltd. ("Afren Nigeria"), one of which was the HIGH ISLAND VII. As primary rig manager, Ochonogor's primary duties were to supervise other TSSN rig managers who were in charge of supervision for the HIGH ISLAND VII.

In this case, the facts are exactly opposite. The land-based rig manager who oversaw operations on the rig was directly employed by GSF receiving his W-2 from GSF.

Finally, in this case Ogden has been paid maintenance and cure benefits since his injury. Importantly, these benefits have been paid by TODDI which is undisputed. The payment of maintenance and cure benefits are due only based upon an employee/employer relationship.

**CONCLUSION**

When Ogden applied for employment with Transocean, his employment application was labeled as being from TODDI.[18]  When he had wages garnished from his checks due to a bankruptcy, it was TODDI that wrote to him to advise they would be making payments to the bankruptcy court.[19]  Finally, when Ogden was transferred overseas in June of 2011, he was given a document entitled 'Terms and Conditions for Commuting Overseas' and nowhere on this document did it state that Ogden would be working for any foreign entity.[20]  This document refers only to 'The Company' throughout.  GSF/TODDI could have clearly spelled out that Ogden's employment was also being transferred but they did not.  Instead, Ogden was left having been given documents including his employment application, releases for information and subsequent payroll garnishment documents his  which only reflect TODDI, and paychecks which reflect only GSF.  Finally, the 'International-Expatriate Rig Based Employee Processing Check List nowhere mentions or references any change in the employment status of Ogden.[21]  The point is GSF/TODDI had the clear ability to notify Ogden that his employer was being switched at that time, but it noticeably failed to do so, leaving Ogden only to assume he was employed by TODDI or GSF.

Ogden submits that the decision in Johnson was intentionally narrow to be limited to the facts before Judge Barbier.  In the Johnson decision Judge Barbier made it clear that (1) it was an issue of first impression which he was considering, (2) Johnson was not alleged to be a direct employee of GSF under the Jones Act as was the case in Spinks and

---

[18] Attached as Exhibit 5 please find Ogden Application dated 10/4/2000.
[19] Attached as Exhibit 6 please find referenced letter from TODDI.
[20] Attached as Exhibit 7 please find Terms and Conditions document.
[21] Attached as Exhibit 8 please find referenced International Check List.

Guidry, and (3) the rig manager was employed by the foreign entity.  All of these facts are opposite in the case now before this Court.  Ogden urges that common sense and logic support GSF as being his potential Jones Act employer in this matter.  The only basis whatsoever in this matter to hold that the foreign entity was the employer of Ogden is based solely upon the foreign entity entering into the drilling contract which was in place at the time of the accident.  The enormous fallacy in such precedent is that Jones Act seamen working aboard foreign oil rigs literally would have no idea of the identity of their employer since these individuals rarely, if ever, know the identity of the party that enters into the actual drilling contract.  Indeed, in this case none of the employees questioned who received their paychecks from GSF knew of the name of the foreign entity.  None of the rig workers deposed believed that they were working for an Egyptian company.  Additionally, when the foreign rigs are under tow from one location to another, they are typically not under contract in the industry.  By whom would the rig workers be employed during such transit?  Who does GSF propose as the employer of these seamen when the rig is not under contract?  If during this window of time the rig employers would potentially be employed by GSF as their payroll employer, then it is simply illogical to remove GSF as a potential employer simply because the rig later enters into a drilling contract which is signed by a foreign entity.

GSF employs more than 300 Americans overseas.  The record in whole establishes that these individuals have continuous contacts with what is known as the "Transocean" building at 4 Greenway Plaza in Huston, Texas.  While these individuals may believe they are employed generally by "Transocean", without doubt none of them believe they

are employed by foreign entities the names of which they have no knowledge simply because these entities have entered into temporary drilling contracts based upon the location of the rig at the time.  At best, GSF has set forth a situation similar to <u>Spinks</u> under which the rig hands including Ogden may have been borrowed employees of the foreign entity.  However, as <u>Spinks</u> clearly held, an injured seaman is required to look no further than his paycheck in order to identify his employer.  It is then incumbent upon the payroll employer to sort out any contractual issues in connection with the employment of the seamen.

For all such reasons, GSF and TODDI's motions to dismiss and/or motion for summary judgment should be denied.

Respectfully submitted,

*s/Timothy J. Young*
TIMOTHY J. YOUNG (22677)
TAMMY D. HARRIS (28986)
The Young Firm
400 Poydras Street, Suite 2090
New Orleans, Louisiana 70130
Telephone (504) 680-4100
Facsimile (504) 680-4101
Email:
tjy@theyoungfirm.com
tdh@theyoungfirm.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing has been served on all counsel of record by electronic means or depositing same in the U.S. Mail, postage prepaid and properly addressed, this 10th day of June, 2014.

*S/Timothy J. Young*
TIMOTHY J. YOUNG