**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **STEVEN OGDEN** | * | **CIVIL ACTION** |
| | * | |
| | * | |
| **versus** | * | **NO. 12-1835** |
| | * | |
| **GLOBALSANTAFE OFFSHORE** | * | |
| **SERVICES, ET AL.** | * | **SECTION "L" (4)** |

<u>**ORDER AND REASONS**</u>

Before the Court is a Motion to Dismiss or alternatively, a Motion for Summary Judgment, filed by Defendants GlobalSantaFe Offshore Services ("GSF") and Transocean Offshore Deepwater Drilling, Inc. ("TODDI").  (Rec. Doc. 37).  The Court has reviewed the submitted memoranda and the applicable law and, after hearing oral argument on the motion, now issues this Order and Reasons.

**I.  BACKGROUND**

This case arises out of back injuries that Plaintiff Steven Ogden allegedly suffered while he was working on the TRANSOCEAN AMIRANTE, a movable offshore oil rig located off the coast of Egypt.  Ogden named two Defendants in the present lawsuit, GlobalSantaFe Offshore Service ("GSF") and Transocean Offshore Deepwater Drilling, Inc. ("TODDI").  He alleges that he was employed by these two corporations as a Jones Act Seaman aboard the rig.  (Rec. Doc. 1 at 2).  Ogden explains that he received his paycheck and W-2 from GSF, and he contends that TODDI maintained control over his employment.  He alleges "dual employment status" and claims that the two entities essentially constitute a common enterprise.  (Rec. Doc. 1

at 3).  Ogden further claims that either or both Defendants owned, operated, and/or controlled the rig, which was a vessel in navigation at all pertinent times.  (Rec. Doc.1 at 2).

Ogden claims that his injuries were caused by the negligence of either or both of the Defendants, who failed to provide him a reasonably safe place to work.  (Rec. Doc. 1 at 3).  He filed the present lawsuit against TODDI and GSF for negligence, unseaworthiness, and maintenance and cure pursuant to the Jones Act and general maritime law.[1]  Ogden asks to be compensated for, among other things, his physical pain and suffering, lost wages, future physical disability, and medical expenses.  (Rec. Doc. 1 at 4).  Ogden also asks for past, present, and future maintenance and cure benefits.  (Rec. Doc. 1 at 4).

## II.  PRESENT MOTIONS

### A.  Defendants' Motion

Very early in this litigation Defendants filed a Motion to Dismiss, or alternatively for Summary Judgment.  (Rec. Doc. 7).  On September 16, 2013, after receiving significant briefing from both sides, the Court denied the motion but reserved Defendants' right to re-urge the motion after the parties had an opportunity to conduct limited discovery on the issues of jurisdiction. (Rec. Doc. 30).  The Court initially gave the parties 45 days to conduct discovery, but ultimately extended this deadline on the parties request on two separate occasions.  (Rec. Docs. 33, 34).  On April 29, 2014, after appropriate discovery, Defendants re-urged their motion to dismiss and motion for summary judgment.  (Rec. Doc. 37).  The parties adopt the arguments that they previously made to this Court and incorporate the new discovery.

---

[1]Ogden has since conceded that neither of the named Defendants is the owner of the rig in question and, therefore, he is no longer pursuing a claim for unseaworthiness.

Defendants ask the Court to dismiss the claims against GSF because this Court lacks personal jurisdiction over that Defendant.[2]  (Rec. Doc. 37-1 at 1).  Defendants claim that "GSF's contacts with Louisiana are sporadic at best."  (Rec. Doc. 7-2 at 4).  Defendants argue that GSF serves as a "paymaster" for various Transocean entities and, as such, deals only with payroll issues.  (Rec. Doc. 7-2 at 4).  According to Defendants, GSF issues paychecks and W-2 forms to Louisiana residents.  Defendants argue that GSF does not have sufficient contacts with Louisiana to support personal jurisdiction in this Court.  (Rec. Doc. 7-2 at 4).  Defendants rely on the Court's opinion in *Anderson v. GlobalSantaFe Offshore Services, Inc.*, 924 F. Supp. 2d 738 (2013).  In *Anderson*, Judge Vance analyzed GSF's contacts with Louisiana and determined that the Court did not have either specific or general jurisdiction over GSF.

Defendants also -- and with respect to GSF, in the alternative -- ask the Court to grant summary judgment in favor of both entities because neither entity was the true employer of Ogden and neither entity had anything to do with the day to day operations of the rig.  (Rec. Doc. 37-1 at 1).  According to Defendants, on the date in question, TRANSOCEAN AMIRANTE was working pursuant to a drilling contract that was entered into by Transocean (Mediterranean and Red Sea) Drilling Limited ("T(M&RS)DL"), a Cayman Islands corporation.  (Rec. Doc. 7-7 at 2).  Defendants claim that TRANSOCEAN AMIRANTE had been chartered to T(M&RS)DL by its owner, Transocean Enterprise, Inc., a Delaware corporation.  (Rec. Doc. 7-7 at 2).  Defendants claim that neither of the named Defendants were parties to this contract and that neither of them were involved in the day to day operations of the rig.  (Rec. Doc. 7-2 at 2).  Defendants reiterate that GSF is only responsible for payroll and does not own or operate rigs.

---

[2] The Defendants do not contest this Court's jurisdiction over Defendant TODDI.  (Rec. Doc. 11 at 2).  One reason for this may be that TODDI has previously used this Court and has filed its

3

(Rec. Doc. 7-2 at 4).  Further, Defendants claim that TODDI operates mostly domestically, though it does handle some matters for foreign entities (such as handling claims like an adjuster, insurance issues, documentation, and similar issues).  (Rec. Docs. 7-2 at 2, 37-1 at 2). Defendants claim that TODDI "had absolutely nothing to do with this rig or its operations at the time of this accident" and was fraudulently joined in order to confer jurisdiction on this Court. (Rec. Doc. 11 at 2).  According to Defendants, TODDI did not employ the crew on the rigs in foreign locations and did not supervise those crews.  (Rec. Doc. 37-1 at 2).  Defendants cite *Johnson v. PPI Technology Services, L.P.*, Nos. 11-2773, 12-1534, 2014 WL 1330084 (E.D. La. April 3, 2014), in support of their position.  In that case, Judge Barbier granted summary judgment in favor of GSF, finding that GSF did not exert enough control over the rig workers to be held vicariously liable for their actions.  *Id.* at *6.

### B.  Ogden's Opposition

In opposition, Ogden claims that "[t]hese defendant entities are trying to hide behind voluminous contracts for the drilling services of the individual rigs which were operating in foreign overseas locations."  (Rec. Doc. 8 at 1).

Ogden argues that this Court has personal jurisdiction over GSF under two separate theories.  First, Ogden argues that, just like the Court found in *Johnson v. PPI Technology Services, L.P. et al.*, Rule 4(k)(2) allows this Court to consider GSF's contacts with the United States as a whole when evaluating jurisdiction.  (Rec. Docs. 47 at 4, 23-1) (citing *Johnson*, 84 F. Supp. 2d 873 (E.D. La. 2013)).  Second, Ogden claims that GSF has had significant contacts with Louisiana that specifically relate to this matter.  Ogden cites *Mark Foster v. GlobalSantaFee Offshore Service & Transocean Offshore Deepwater Drilling Inc.*, No. 13-

own lawsuit in this forum.  (Rec. Doc. 8-16)

00065, 2013 WL 4012705 (E.D. La. Aug. 6, 2013).  In that case, Judge Berrigan found that "it is likely that the Court has specific jurisdiction" over GSF.  Like the plaintiffs in *Foster*, Ogden points out that GSF sends paychecks to Louisiana residents and has "essentially satisfied its cure obligation, in part, through activities and medical treatment taking place in the State of Louisiana."  (Rec. Doc. 47 at 5).

With respect to the summary judgment issues, Ogden argues that GSF and/or TODDI should be considered Ogden's Jones Act employer.  According to Ogden, recent deposition testimony indicates that the employees who ran the rig and operated as rig manager in Egypt were paid by GSF.  (Rec. Doc. 47 at 2).  Ogden emphasizes that his paycheck as well as various documents regarding his employment indicate that they were from GSF and/or TODDI.  (Rec. Doc. 47 at 7) (citing Rec. Doc. 47-1 at 33, 35, 36).  Ogden argues that TODDI played a "particularly active role" in this case because TODDI, through its adjuster, contacted Ogden after the accident and agreed to pay voluntary compensation payments to him.  (Rec. Doc. 8 at 7).  Ogden claims that he received such payments from TODDI until he filed the present lawsuit.

Ogden claims that it would defy logic for GSF and/or TODDI not to be considered the Jones Act employer of Ogden just because a drilling contract, which was entered into by a foreign entity, was in place.  (Rec. Doc. 47 at 8).  Ogden argues that such a regime would result in Jones Act seamen having no idea who their employer was at any given point in time.  Ogden also points out that this interpretation would lead to significant problems.  For instance, who would be the employer when the rigs are under tow from one location to another?  (Rec. Doc. 47 at 8).  Ogden claims that Fifth Circuit precedent dictates that a Jones Act seaman should look no further than his paycheck in order to identify his employer.  (Rec. Doc. 47 at 9).

Ogden also provides details regarding the intertwined relationship between GSF and TODDI.  Ogden relies on Bradeley McKenzie's deposition, the global payroll manager who was produced as a representative of GSF for a 30(b)(6) deposition.  (Rec. Doc. 7-9).  Mr. McKenzie testified that he was an employee of TODDI and that he, along with other employees in the payroll department for GSF, received his W-2 from TODDI each year.  (Rec. Doc. 7-9, p 5).  The payroll department, which administers payroll for GSF, is located in Houston, Texas.  Ogden claims that "[t]he ability to terminate a GSF employee's pay would ultimately occur at 4 Greenway Plaza in the payroll department which is staffed entirely by individuals who receive their W-2 forms from [TODDI]."  (Rec. Doc. 8 at 5).  Because of this fact, Ogden argues that "it appears that TODDI itself is the actual employer of the individuals, including Mr. Ogden, who work oversees."  (Rec. Doc. 8 at 7).

## III.  LAW AND ANALYSIS

### A.    Jurisdiction

To begin at the beginning, it is necessary to consider whether this Court has jurisdiction over this injury which occurred in foreign waters off the coast of Egypt.  Personal jurisdiction is "'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'"  *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (quoting *Employers Reinsurance Corp. v. Bryant*, 299 U.S. 374 (1937)).  The party seeking to invoke the power of the court bears the burden of establishing personal jurisdiction.  *Pervasive Software Inc. v. Lexware GmbH & Co. KG*, 688 F.3d 214, 219 (5th Cir. 2012).  That party "need not, however, establish jurisdiction by a preponderance of the evidence; a *prima facie* showing suffices."  *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citing *Wyatt v. Kaplan*, 686 F.2d 276, 280 (5th Cir. 1982)).  When the district court decides a

defendant's motion to dismiss without an evidentiary hearing, "[t]he allegations of the complaint, except insofar as controverted by opposing affidavits, must be taken as true, and all conflicts in the facts must be resolved in favor of the plaintiffs for purposes of determining whether a prima facie case for personal jurisdiction has been established." *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985).

A federal court has personal jurisdiction over a non-resident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant and such jurisdiction complies with the Due Process Clause of the Fourteenth Amendment. *See Latshaw v. Johnson*, 167 F.3d 208, 211 (5th Cir. 1999). Louisiana's long-arm statute extends jurisdiction to the constitutional limit. *See* La. Rev. Stat. ann. § 13:3201. Therefore, this Court must only focus on whether the exercise of jurisdiction in this case satisfies the federal due process requirements. *Anderson*, 924 F. Supp. 2d at 742 (citing *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 336 (5th Cir. 1999)).

"The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume jurisdiction *in personam* of a non-resident defendant unless the defendant has meaningful 'contacts, ties, or relations' with the forum state." *Luv N' care*, 438 F.3d at 469 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)). Jurisdiction may be general or specific. "Where a defendant has 'continuous and systematic general business contacts' with the forum state, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984), the court may exercise 'general' jurisdiction over any action brought against that defendant." *Luv N' care*, 438 F.3d at 469. On the other hand, "[s]pecific jurisdiction exists when a nonresident defendant 'has purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Anderson*, 924 F. Supp. 2d at 742

7

(quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 857 (5th Cir. 2001)).  A third alternative exists when the underlying claim arises under federal law.  A federal court can assert jurisdiction over a non-resident based on the defendant's contacts with the United States as a whole, rather than a particular state, pursuant to Federal Rule of Civil Procedure 4(k)(2), if certain conditions are met.

*1. Federal Rule of Civil Procedure 4(k)(2)*

Federal Rule of Civil Procedure 4(k)(2) provides:

> For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).  The United States Court of Appeals for the Fifth Circuit has concluded that cases falling under a federal court's admiralty jurisdiction are "claim[s] arising under federal law" for the purpose of Rule 4(k)(2).  *See World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 723 (5th Cir. 1996).  Therefore, Rule 4(k)(2) applies in the present case if the Plaintiff Ogden can demonstrate that "(1) the defendant in question is not subject to the general jurisdiction of any other state, and (2) that exercising jurisdiction is consistent with the due process clause of the Fifth Amendment, meaning that the defendant has sufficient minimum contacts with the United States as a whole."  *Johnson*, 926 F. Supp. 2d at 882 (citing *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004)).  The Fifth Circuit has held that a "piecemeal analysis of the existence *vel non* of jurisdiction in all fifty states is not necessary.  Rather, so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction."  *Adams*, 364 F.3d at 651.  "If . . . the defendant

contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Id.* (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).

GSF does not concede jurisdiction in another state nor does it identify another forum in which suit may be possible.  Instead, GSF argues that Rule 4(k)(2) does not require it to do so. GSF argues that "Rule 4(k)(2) cannot possibly be designed to compel a defendant who raises legitimate jurisdictional objections, to concede jurisdiction in one particular forum in order to avoid having to litigate in a less convenient forum."  (Rec. Doc. 21 at 3).  GSF takes issue with *Johnson v. PPI Technology Services, L.P.*, in which this Court found that it had jurisdiction over GSF pursuant to Rule 4(k)(2).  926 F. Supp. 2d at 885.  GSF claims that in *Adams* the defendant explicitly opposed jurisdiction in any forum.  (Rec. Doc. 21 at 3).  GSF argues that it, unlike the defendant in *Adams*, takes no position on whether jurisdiction would exist in a different forum. GSF argues that it should be allowed to take no position without being subject to jurisdiction under Rule 4(k)(2).

The Court disagrees with GSF's interpretation of *Adams*.  While the defendant in *Adams* explicitly opposed jurisdiction in all forums, the Fifth Circuit did not limit its decision to cases that involved explicit opposition.  Instead, the Fifth Circuit stated that "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction." *Adams*, 364 F.3d at 650.  Furthermore, in reaching this decision, the Fifth Circuit relied on the Seventh Circuit's decision in *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548 (7th Cir. 2001).  In that case, the Seventh Circuit, describing the analysis required by Rule 4(k)(2), stated:

> . . . Constitutional analysis for each of the 50 states is eminently
> avoidable by allocating burdens sensibly.  A defendant who wants
> to preclude use of Rule 4(k)(2) has only to name some other state

> in which suit could proceed.  Naming a more appropriate state
> would amount to a consent to personal jurisdiction there (personal
> jurisdiction, unlike federal subject-matter jurisdiction, is waivable).
> If, however, the defendant contends that he cannot be sued in the
> forum state and refuses to identify any other where suit is possible,
> then the federal court is entitled to use Rule 4(k)(2).  *See Central
> States Pension Fund v. Reimer Express World Corp.*, 230 F.3d
> 934, 940 (7th Cir. 2000).  *See also United States v. Swiss American
> Bank, Ltd.*, 191 F.3d 30, 40-42 (1st Cir. 1999).  This procedure
> makes it unnecessary to traipse through the 50 states, asking
> whether each could entertain the suit.

*ISI Int'l*, 256 F.3d at 552 (citing *U.S. v. Swiss American Bank, Ltd.*, 191 F.3d 30, 41 (1st Cir.

1999)).[3]  These cases make clear that in order for 4(k)(2)(a) to preclude application of the Rule,

the defendant must identify another forum where jurisdiction would exist.  Since GSF has not

done so, and refuses to do so, this Court can proceed with the application of the Rule.

"In applying Rule 4(k)(2) the Court must determine whether the defendant has sufficient

ties to the United States as a whole to satisfy constitutional due process concerns." *Adams*, 364

F.3d at 651 (citing *World Tanker*, 99 F.3d at 723).  Accordingly, the Court now examines GSF's

contacts with the United States as a whole.  Most of the relevant information was provided by

GSF's representative Bradley McKenzie during GSF's corporate deposition, which was attached

---

[3] In *United States v. Swiss American Bank*, which was cited by the Seventh Circuit in *ISI Int'l*,
the First Circuit crafted a "special burden-shifting framework" for apply Rule 4(k)(2) in order to
avoid forcing either party to prove the negation requirement of the Rule.  While the Fifth Circuit
has not explicitly adopted this burden-shifting framework, it is still instructive to this Court's
analysis as it was relied on by the Seventh Circuit.  The First Circuit's burden-shifting framework
requires the plaintiff to first make a prima facie case for the applicability of Rule 4(k)(2).  If the
plaintiff meets this burden, "the burden shifts to the defendant to produce evidence which, if
credited, would show either that one or more specific states exist in which it would be subject to
suit or that its contacts with the United States are constitutionally insufficient. . . . Should the
defendant default on its burden of production, the trier may infer that personal jurisdiction over
the defendant is not available in any state court of general jurisdiction." *Swiss American Bank,
Ltd.*, 191 F.3d at 41-42.  Under the First' Circuits test, the defendant cannot meet his burden by
simply taking "no position" on whether jurisdiction exists in a different forum, as GSF is trying
to do.

to Defendants' motion.  (Rec. Doc. 37-9).  According to McKenzie, GSF operates out of 4 Greenway Plaza in Houston, Texas.  (Rec. Doc. 37-9 at 3).  GSF is affiliated with the Transocean entities and operates as a payroll company for those entities.  (Rec. Doc. 37-9 at 11).  GSF distributes pay and issues W-2's to approximately 300 American citizens who are working internationally.  (Rec. Doc. 37-9 at 4).  GSF only distributes payroll to U.S. workers.  (Rec. Doc. 37-9 at 4).  The W-2's are processed by a payroll department that is based in Houston, Texas. (Rec. Doc. 37-9 at 5).  GSF also withholds federal taxes from its U.S. employees and reports these federal withholdings to the IRS.  (Rec. Doc. 37-9 at 6).  Mr. McKenzie also stated that U.S. employees who are going to work overseas get their visa applications and overseas documents from GSF's immigration department, which is located in Houston, Texas.  (Rec. Doc. 37-9 at 9). Ogden provided a copy of his paycheck stub, which indicates that GSF is the issuer and is located at 4 Greenway Plaza in Houston, Texas.  (Rec. Doc. 8-1 at 1).  Because of the significant contacts that GSF has with the United States, the Court finds that exercising jurisdiction over GSF would be consistent with the laws and Constitution of the United States.

This finding is consistent with two other sections of this Court, which similarly held that GSF is subject to the jurisdiction of this Court under Rule 4(k)(2).  *See Johnson,* 926 F. Supp. 2d at 885-86 (holding that "by virtue of Rule 4(k)(2) [this Court] has personal jurisdiction over GSF in the instant matter"); *Foster v. GlobalSantaFe Offshore Service,* No. 13-00065, 2013 WL 4012705 (E.D. La. 2013) (holding that even if this Court did not have specific jurisdiction over GSF "it would have general jurisdiction under Federal Rule of Civil Procedure 4(k)(2)").  This result is also consistent with the purpose of Rule 4(k)(2).  The Rule was enacted "to fill an important gap in the jurisdiction of federal courts in cases arising under federal law."  *Adams*, 364 F.3d at 651.  Prior to this rule, "a defendant may have [had] sufficient contacts with the

United States as a whole to satisfy due process concerns, [but] if she had insufficient contacts with any single state, she would not be amenable to service by a federal court sitting in that state." *World Tanker Carriers Corp.,* 99 F.3d at 721. As a result, foreign defendants could evade responsibility for civil violations of federal law by operating in a way that limited the defendant's single-state contacts. *See Swiss American Bank*, 191 F.3d at 40. Rule 4(k)(2) was adopted in response to this problem, which is the same problem that would be present in this case were the Court to find that it does not have jurisdiction over GSF. *World Tanker Carriers Corp.*, 99 F.3d at 722. GSF has significant contacts with the United States. In fact, the record shows that the United States can be fairly regarded as GSF's "home." *Cf. Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2853 (2011) (describing the requirements for "general jurisdiction" and explaining that "[f]or an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as home."). GSF should not be allowed to maintain these significant contacts with the United States and yet evade liability under federal law because it lacks state-specific contacts. Having determined it has jurisdiction, the Court proceeds to analyze the summary judgment motion.

### B.      Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317,

12

322 (1986) (quoting Fed. R. Civ. P. 56(c)).  When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion."  *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).  The court must find "[a] factual dispute [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [and a] fact [to be] 'material' if it might affect the outcome of the suit under the governing substantive law."  *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Defendants ask the Court to grant summary judgment because, they claim, they are not Ogden's employers and had no control over the work that he did on the rig.  The Court must consider whether there is a genuine issue of material fact as to Defendants' status as Ogden's Jones Act employers.

### 1.    *Jones Act Liability*

"By the express terms of the Jones Act an employer-employee relationship is essential to recovery."  *Spinks v. Chevron Oil Co.*, 507 F.2d 216, 224 (5th Cir. 1975).  Therefore, a Jones Act claim requires proof of an employment relationship.  *See Guidry v. S. La. Contractors, Inc.*, 614 F.2d 447, 452 (5th Cir. 1980).  "The employer need not be the owner or operator of the vessel." *Id.* (citing *Barrios v. La. Constr. Materials Co.*, 465 F.2d 1157 (5th Cir. 1972)).  Further, the Fifth Circuit has held that it is possible for a seaman to have more than one Jones Act employer. *Guidry*, 614 F.2d at 452 (citing *Spinks*, 507 F.2d at 225-26).

There is no one test for determining whether a defendant may be properly considered a Jones Act employer.  The analysis largely depends on which party or entity is being sued. Courts have provided various tests and lists of factors that should be considered.  For instance,

the Fifth Circuit explained that when a seaman sues his payroll employer, the question is whether

that employer "has divested itself of all control over the employee."  *Guidry*, 614 F.2d at 454.

On the other hand, when a court is deciding whether the borrowed servant doctrine applies, and

thus a non-payroll entity can be considered the plaintiff's employer, the court considers various

factors.  *See Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969).  These factors include:

who has control over the employee, whether there was temporary termination by the general

employer of its relationship with the employee, who furnishes the employee with the necessary

instruments and the place for performance of work, how much time will the employment last,

who has the right to discharge the employee, and who is obligated to pay the employees wages.

*See id.* at 313.  In *Cosmopolitan Shipping Company v. McAllister*, the Supreme Court stated that

a court should "look at the venture as a whole.  Whose orders controlled the master and the

crew?  Whose money paid their wages?  Who hired the crew?  Whose initiative and judgment

chose the route and the ports?"  337 U.S. 783, 795 (1949); *see also Corsair v. Stapp Towing Co.,*

*Inc.*, 228 F. Supp. 2d 795, 798 (S.D. Tex. 2002) ("Factors influencing this determination include

the following: the control exercised over the details of the work, the amount of supervision, the

power to hire or fire the worker, the method of payment, the management and benefit of the

operation as a whole, and the parties' understanding of the relationship.") (citing *Wheatley v.*

*Gladden*, 660 F.2d 1024, 1026 (4th Cir. 1981); *Spinks*, 507 F.2d 216, 224 (5th Cir. 1975)).

     The Defendants focus almost all of their attention and evidence on the factor of control.

For instance, Defendants point to deposition testimony in which employees on the rig testify that

TODDI had nothing to do with the day to day operations of the rig.  (Rec. Doc. 37-1 at 6).

Defendants submit a declaration from Bobby Browning, the Operations Manager on the rig at the

time of Ogden's injury, who says that neither GSF nor TODDI had anything to do with the day to

day operations of the rig.  (Rec. Doc. 43-4 at 2).  The Court agrees that the evidence does strongly support the fact that neither GSF nor TODDI had an active presence on the rig and that neither company controlled the day to day operations of the rig.[4]  However, this fact is by no means conclusive.  The Court must analyze all of the facts surrounding the relationship between TODDI, GSF and Ogden in order to conclude that those companies are, or are not, his Jones Act Employer.

In *Spinks v. Chevron Oil Company*, the Fifth Circuit dealt with a similar situation as the one in this case.  507 F.2d at 224.  The Fifth Circuit explained that courts have been receptive to the borrowed servant doctrine.  "If a prime contractor has assumed enough of the incidents of an employer, such as the right to control an employee's work, he will be deemed a seaman's employer."  *Id.* at 224.  However, the Fifth Circuit emphasized the fact "[t]hat a seaman is a borrowed servant of one employer does not mean that he thereby ceases to be his immediate employer's servant."  *Id.* at 224.  In *Spinks*, the plaintiff was employed by Labor Services, Inc. but was performing work for Chevron Oil Company on one of Chevron's drilling barges.  *Id.* at 218.  The Court found that "[i]n any common sense meaning of the term, Labor Services was Spink's employer.  He was hired and paid by Labor Services.  That company, not Chevron, withheld taxes and social security payments from his salary, and forwarded them to the government as required by an employer by law.  Labor Services employed Spink's co-worker Walker and his supervisor Hanks.  Hanks could fire Spinks; the record strongly suggests that Chevron could not--it could merely have Labor Services recall and replace him."  *Id.* at 224.  The Fifth Circuit concluded that "[w]e do not quarrel with the trial court's finding that Chevron had

---

[4]  The Court does find that the evidence indicates that the other workers on the rig had the same relationship with TODDI and GSF that Ogden had and received their paychecks from GSF.  This

sufficient control over [the plaintiff] to be a borrowing employer.  We merely hold that under the

Jones Act, Labor Services remained his employer."  Similarly, this Court does not quarrel with

Defendants' contention that T(M&RS)DL may have had sufficient control over Ogden to be

considered a borrowing employer of Ogden.  However, the Court finds that there is significant

evidence in the record indicating that TODDI remained Ogden's employer under the Jones Act.

a.      TODDI's Status as Ogden's Jones Act Employer

Like in *Spinks*, the record in this case indicates that in any common sense meaning of the

term, TODDI was Ogden's employer.  On October 4, 2000, when Ogden applied for a job, his

application had TODDI's name and address at the top of the document and it stated that

"Transocean Offshore Deepwater Drilling Inc. and/or Subsidiaries and Affiliates provides equal

opportunity to all qualified persons . . ."  (Rec. Doc. 47-1 at 33).  On the same day that he applied

for a position, he also signed a document which authorized TODDI to obtain his consumer

reports.  (Rec. Doc. 47-1 at 34).  At some point during his employment he received a letter from

TODDI explaining that TODDI was going to withhold a portion of his salary pursuant to a

bankruptcy order that it received.  (Rec. Doc. 47-1 at 35) ("Transocean Offshore Deepwater

Drilling Inc. has received the above captioned document from the United States Bankruptcy

Court . . . This document requires the company to withhold a portion of your salary . . .").  After

Ogden was injured, he received a letter from Shuman Services, Consulting, Solutions, which

stated that it was the independent adjuster assisting TODDI in the handling of Ogden's work-

related injury.  (Rec. Doc. 8-6 at 1).  The letter stated that TODDI would provide maintenance

payments to Ogden and that TODDI was offering him a monetary advance under the

"Transocean Offshore Deepwater Drilling, Inc.'s Voluntary Compensation Program."   (Rec.

---

includes the OIM who gave direction and controlled operations on the rig.  (Rec. Doc. 43-1 at 9)

Doc. 8-6 at 1).  When Ogden received his check for maintenance payments it stated that it was

coming from TODDI.  (Rec. Doc. 8-8 at 1).

 Also significant is the document entitled Terms and Conditions for Commuting Overseas.

(Rec. Doc. 43-3 at 1).  The document has the name "Transocean" at the top of it and it details the

employer-employee relationship that will exist between Ogden and "the Company" as Ogden

works overseas.  (Rec. Doc. 43-3 at 1).  The document does not specify to which entity "the

Company" is referring.  However, during oral argument the Defendants explained that the

"Authorized Representative" of "the Company" was a representative of TODDI.  Therefore, for

the purposes of this motion, the Court assumes that "the Company" is referring to TODDI.  The

document explains that TODDI would assign Ogden to work on a rig overseas.  Section 3

provides that TODDI "reserves the right to change [Ogden's] assignment location at any time,

including reassignment to [Ogden's] home country.  Refusal to accept an assignment is

considered resignation."  (Rec. Doc. 43-3 at 2).  Section 4 provides that TODDI "shall have the

right, in its discretion, to change [Ogden's] compensation, either upward or downward, from

time to time, provided that [he] will be notified in advance of any such adjustments becoming

effective."  (Rec. Doc. 43-3 at 2).  Section 5 provides that TODDI will furnish and pay for

Ogden's transportation to the work location.  If Ogden wishes to change his point of departure in

his home country, he must get approval from the "Division of Human Resources Manager."

(Rec. Doc. 43-3 at 3).  Section 6 provides that TODDI "has the right to terminate [Ogden's]

employment at any time without cause."  (Rec. Doc.43-3 at 4).  Section 8 provides that TODDI

"shall have the right to make whatever changes in the terms of this document, [Ogden's] job

assignment, job classification, and other factors affecting [his] employment as it, in its sole

discretion, deems appropriate . . ."  (Rec. Doc. 43-3 at 4).  By the terms of the document, TODDI

17

maintains a substantial amount of control over Ogden's assignment and the details of his employment.

The fact that TODDI was not the named entity on Ogden's paychecks does not change this Court's conclusion that TODDI may be liable under the Jones Act as Ogden's employer.  In *Spinks v. Chevron Oil Company*, the Fifth Circuit stated "[t]hat a seaman is a borrowed servant of one employer does not mean that he thereby ceases to be his *immediate employer's* servant." 507 F.2d at 224 (emphasis added).  The Court in *Spinks* described several aspects of the employment relationship that indicated that the plaintiff's "immediate employer" should be considered the Jones Act employer.  One of the many factors was the payment of wages. However, there were many other considerations.  *See* 507 F.2d at 225.  Subsequently, Courts have interpreted *Spinks* as holding that a seaman "is entitled to look no further than the signature on his [pay]check" to determine who his employer is for the purposes of the Jones Act.  *See Guidry*, 614 F.2d at 454.  However, this description of *Spinks* is somewhat misleading as *Spinks* did not limit its rule to a seaman's "payroll employer."[5]

The fact that the Fifth Circuit in *Spinks* did not intend to limit the application of its rule to the employer who signs the seaman's paycheck becomes even more apparent when one looks at the reasoning that the court gave for its holding.  The Fifth Circuit rejected the theory that a seaman can only have one Jones Act employer.  The court explained:

---

[5] It should be noted that in substance TODDI does seem to be Ogden's "payroll employer." Defendants have repeatedly argued that GSF is nothing more than a "paymaster." (Rec. Doc. 37-1 at 3).  Mr. McKenzie testified that GSF is "an entity that . . . the payroll department uses as a payroll company to distribute pay to those workers that are working international[ly]. . ." (Rec. Doc. 37-9 at 11).  All of the employees that work at GSF are paid by TODDI.  (Rec. Doc. 37-9). Therefore, even though TODDI's name was not on Ogden's paychecks, it still can be considered Ogden's "payroll employer" for the purpose of the Jones Act employer analysis.

> If this means that an injured seaman must speculate at his peril on whether the trial court ultimately will find him a borrowed employee of the shipowner, or an employee of his immediate employer, we reject that theory. Such a rule can result in defeating Jones Act rights through contractual manipulations. We see nothing offensive in suing an immediate employer under the Act, or even both employers in the alternative. The defendants can sort out which between them will bear the final cost of recovery. . . . This is especially important in the area of offshore drilling operations, where oil exploration companies customarily contract for all labor.

*Spinks*, 507 F.2d at 225. If anything, this reasoning applies even more forcefully in the present situation where an additional entity, and an additional layer of confusion, has been added to the mix. Under Defendants' theory, seamen like Ogden would be left to speculate as to whether they are employees of the rig operator, T(M&RS)DL, the immediate employer, TODDI, or the payroll employer, GSF. Such a holding would impose an intolerable hardship on the injured seaman and would allow companies to defeat Jones Act rights through contractual manipulations, like the ones that are present in this case. Because of the complicated structure and roles of the various entities, employees, like Ogden, do not know who their real employer is. For instance, Bobby Odom, a toolpusher and OIM on the AMIRANTE, stated in his deposition that he did not know whether he was working for an Egyptian company while on the rig. (Rec. Doc. 43-1 at 15). He also testified that he thought his employer was the same company that was operating out of 4 Greenway Plaza in Houston, Texas. (Rec. Doc. 43-1 at 8). As the Fifth Circuit explained in *Baker v. Raymond International, Inc.*, "the injured worker is not required to bear the risk that he will select the proper target for his claim." 656 F.2d 173, 178 (1981). Accordingly, the Court finds that it is possible for Ogden to have multiple Jones Act employers and that TODDI was properly named in this lawsuit.

> ### i.    Section 10 of the Terms and Conditions for Commuting Overseas

The Defendants argue that even assuming that TODDI was Ogden's employer, TODDI was replaced as Ogden's employer pursuant to the "Terms and Conditions for Commuting Overseas." This document was signed by Ogden as well as a representative of TODDI. Near the end of the document, Section 10 states:

> The Company shall have the right to assign me to work for an affiliated Company on the terms specified in this document. Effective upon the date of any such assignment, the Company shall cease to be my employer, shall be replaced by the Company to which I have been assigned and shall be released from any liability arising out of my employment for such Company.

(Rec. Doc. 43-3 at 5). Defendants argue that this section is controlling and requires the Court to find that T(M&RS)DL was Ogden's employer and not TODDI. The Court disagrees.

Title 45 U.S.C. § 55 states that "[a]ny contract, rule, regulation, or devise whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void . . ." This section is part of the Federal Employers' Liability Act, which governs railway employees. The Jones Act incorporates the standards established by FELA. *Spinks*, 507 F.2d at 225; *see also* 46 U.S.C. § 30104 ("A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."). The Fifth Circuit has explained that because the Jones Act incorporates the provisions of FELA, "the Jones act protects seafaring workers against all manner of contracts and agreements which undertake to

20

lessen or avoid the strict responsibilities imposed by Congress on the employers of seamen." *Stevens v. Seacoast Co.*, 414 F.2d 1032, 1037 (5th Cir. 1969) (citing 45 U.S.C. § 55).

*Corsair v. Stapp Towing Company, Inc.* provides an instructive application of this rule. 228 F. Supp. 2d 795 (S.D. Tex. 2002). In that case, the plaintiff completed and signed a form which stated that he was an "independent contractor." *Id.* at 796. The form also instructed the company not to withhold taxes from his pay because of his independent contractor status. *Id.* The defendant company argued that because the plaintiff was an independent contractor, he could not sue the company as an employer under the Jones Act. *Id.* at 798. The court rejected that argument, stating that "[t]his form appears to be nothing more than a contrivance, the sole and obvious purpose of which is to avoid the obligations of the Jones Act." *Id.* Therefore, the court, citing the Supreme Court's decision in *Stevens v. Seacoast Company*, held that the form was "void as a matter of public policy." *Id.* at 799.

Just like the court in *Corsair*, this Court finds that Section 10 is void as a matter of public policy. Section 10 undertakes to lessen or avoid the responsibilities that Congress imposes on the employers of seamen. The Terms and Conditions document provides comprehensive details about the future employer-employee relationship between TODDI and Ogden. In fact, the document provides four pages of provisions regarding TODDI's ongoing authority to control the employment of Ogden. Then on page five, Section 10 states that TODDI "shall be released from any liability arising out of [Ogden's] employment for such Company." (Rec. Doc. 43-3 at 5). This provision is inconsistent with the rest of the provisions in the document and it seems to be nothing more than an attempt by TODDI to avoid liability under the Jones Act. For that reason, Section 10 is void as a matter of public policy, pursuant to 45 U.S.C. § 55.

21

Even if Section 10 was not invalid, it still would not be decisive.  The United States Supreme Court has explained that when determining who the employer is under the Jones Act, "[s]uch words as employer, agent, independent contractor are not decisive." *Cosmopolitan*, 337 U.S. 783 (1949).  In that case, the Supreme Court was examining a standard service agreement which stated that the plaintiff was an employee of the United States.  *Id.* at 786-94.  The Supreme Court explained that "[n]o single phrase can be said to determine the employer.  One must look at the venture as a whole.  Whose orders controlled the master and the crew?  Whose money paid their wages?  Who hired the crew?  Whose initiative and judgment chose the rouge and the ports?"  *Id.* at 795.  Following the Supreme Court's instruction, the Court finds that the statement in Section 10 of Ogden's Terms and Conditions is not decisive.  Instead, the Court must still consider other details of Ogden's work and relationship with the various employer entities.  Having done so, the Court concludes that at the very least there are issues of material fact as to whether TODDI is Ogden's Jones Act employer.

> b.     GSF

Unlike TODDI, the Court does not find that GSF is Ogden's employer under the Jones Act.  There is little evidence in the record that GSF did anything more than distribute paychecks to Ogden for TODDI.  Mr. McKenzie testified that GSF is merely "an entity . . . that the payroll department uses as a payroll company to distribute pay to those workers that are working international[ly]."  (Rec. Doc. 37-9 at 11).

The addition of GSF as a "paymaster" adds an additional element of confusion, making it even harder for someone like Ogden to know or understand who his employer is.  For that reason, there are strong policy considerations that influence this Court to rely on the Fifth Circuit's statement in *Guidry* and hold that Ogden "is entitled to look no further than the

signature on his check.  He need not scout for further clues concerning who was his real

employer . . ."  614 F.2d at 454.  However, as was detailed previously, the evidence in the record

indicates that TODDI was the true employer of Ogden and that TODDI was the entity that

maintained authority over Ogden even while he worked overseas.  In fact, not only did TODDI

maintain control over Ogden, but it also exerted control over GSF, the entity that sent paychecks

to Ogden.  The employees who worked at GSF got their paychecks from TODDI.  (Rec. Doc.

37-9).

Despite having found that GSF was not Ogden's Jones Act employer, the Court still finds

it important to distinguish the recent decision in *Johnson v. PPI Technology Services, L.P.* from

the present case.  In that case, this Court granted summary judgment in favor of GSF.  Nos. 11-

2773, 12-1534, 2014 WL 1330084 (E.D. La. April 3, 2014).  Defendants submit this opinion in

support of their argument that GSF is not Ogden's Jones Act employer.  However, the decision

in *Johnson* in inapplicable here.

The issue before the Court in *Johnson* was whether "a 'paymaster' may be considered the

rig workers' employer in the context of vicarious liability for negligence under general maritime

law."  *Id.* at *4.  The Court concluded that GSF was only a paymaster and "exerted no control

over the rig workers."  *Id.* at *7.  Therefore, this Court held that GSF could not be held

vicariously liable for the rig worker's alleged negligence.  Here, the Court is deciding whether

GSF can be considered an employer under the Jones Act.  The Fifth Circuit has explained that

"while the determination of vicarious liability is related to determining whether a defendant is an

employer under the Jones Act, they are not assayed by identical standards.  The Jones Act is

remedial legislation and as such should be liberally construed in favor of injured seamen.

However, vicarious liability is a separate question and does not necessarily turn solely on

employment status." *Guidry*, 614 F.2d at 455 (citation omitted).  For this reason, the Court's

decision in *Johnson* has virtually no bearing on this Court's analysis.

## IV. CONCLUSION

      For the foregoing reasons, **IT IS ORDERED** that Defendants' Motion, (Rec. Doc.

37), is **DENIED IN PART AND GRANTED IN PART.**  The motion is denied insofar as it

seeks dismissal of the claim against GSF on jurisdictional grounds.  However, the motion for

summary judgment is granted with respect to GSF, as the Court finds that GSF is not Ogden's

Jones Act employer.  The motion for summary judgment is denied with respect to TODDI.



      New Orleans, Louisiana, this 14th day of July, 2014.




                                 UNITED STATES DISTRICT JUDGE